IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DANIELA MILIOTO-MARUCA :
:
    Plaintiff, : Case No. 3:11-CV-2120
:
v. : (Judge Richard P. Conaboy)
: **FILED**
POLO RALPH LAUREN : **SCRANTON**
:
    Defendant. : DEC 07 2012

PER _____
DEPUTY CLERK

**MEMORANDUM**

We consider here a Motion for Summary Judgment (Doc 15) filed by Defendant Polo Ralph Lauren ("RL") on August 17, 2012. That motion has been fully briefed by the parties (Docs. 15-13, 20, and 21) and is ripe for disposition.

**I. Factual Background.**

This case concerns alleged violations of the Gender Discrimination Provisions of the Federal Civil Rights Act, 42 U.S.C. § 2000e, et seq. and the Pregnancy Discrimination Act, 42 U.S.C. 2000e(K). (Doc. 1 at 6-9). Plaintiff Daniela Milioto-Maruca ("Plaintiff") was employed by RL as the General Manager of two stores in Tannersville, Pennsylvania from January 7, 2008 until March 13, 2009 (Doc. 15, ¶¶ 4 and 56; Doc. 18, ¶¶ 4 and 56). As General Manager of the Tannersville stores, Plaintiff managed a team of up to 75 employees. (Doc. 15, ¶ 9; Doc. 18, ¶ 9). During her tenure as a general manager for RL, Plaintiff reported to Michele Baehr ("Baehr"), District Manager of the Metro Pennsylvania

1

District (Doc. 15, ¶ 6; Doc. 18, ¶ 6). Shortly after Plaintiff began working for RL, RL began to receive complaints, most of them anonymous, from employees about Plaintiff's management style. (Doc. 15 at ¶ 11 referencing the Weatherspoon Declaration, ¶ 8).[1] Between April 5, 2008 and April 21, 2008 seven (7) separate calls, six (6) of which were anonymous, were placed to RL's Fair Employment Practices Hotline ("Hotline") which complained of the demeaning and condescending attitude Plaintiff took with her subordinates. (Doc. 15-1, citing Weatherspoon Declaration at ¶¶ 9-15 and Ex. 8 thereto). Plaintiff was pregnant at the time these calls were placed but she does acknowledge that the employees who called the Hotline in April of 2008 to complain about her did not know of her pregnancy at the time they lodged the complaints. (Doc. 15-1, ¶ 28; Plaintiff's Deposition at 177-199).

In May of 2008, Plaintiff learned that she was pregnant with her first child and that delivery was due on or about December 25,

---

[1] Plaintiff's response to this assertion consists of a denial accompanied by a non-sequitur to the effect that she was not aware that complaints were being made against her. The denial includes no reference to anything in the record that supports it in any way as required by Local Rule 56.1 which, in pertinent part, states: "Statements of material facts in support of, or in opposition to, a motion <u>shall include references to the parts of the record that support the statements.</u> All material facts set forth in this statement required to be served by the moving party <u>will be deemed to be admitted</u> unless controverted by the statement required to be served by the opposing party." (emphasis added). Plaintiff's 56.1 Response to Defendant's Statement of Undisputed Material Facts is replete with denials accompanied by non-responsive rejoinders that are unsupported by reference to anything in the record. As such, Plaintiff's effort to comply with Local Rule 56.1 is an abject failure. Nonetheless, all facts found by the Court that are unaccompanied by a citation to any of Plaintiff's filings have been deemed admitted due to the Court's conclusion, after scouring the entire record, that it contains nothing to support Plaintiff's denials. *Boswell v. Eoon, et al*, 452 Fed. Appx. 107, 2001 WL 5597429 (3d. Cir. 2011).

2

2008 (Doc. 15-1, ¶ 23; Plaintiff's Deposition at 83-84, 91). After learning that she was pregnant, Plaintiff shared this news with Baehr, her immediate supervisor, who congratulated her and inquired whether she planned to return to work after giving birth. (Doc 15-1, ¶¶ 24-25; Doc. 18, ¶¶ 24-25 and Plaintiff's Deposition at 115). Plaintiff interpreted Baehr's question as to whether she would return to work as a disparaging remark. (Doc. 15-5; Plaintiff's Deposition at pages 115-116).

Plaintiff acknowledges that the employees who called the "Hotline" to complain about her in April of 2008 did not know of her pregnancy at the time they made the complaints. (Doc. 15-1, ¶ 28; Plaintiff's Deposition at 177-199). After Plaintiff announced her pregnancy to Baehr, four additional calls that complained of Plaintiff's workplace demeanor and of the way she treated her subordinates were placed to the "Hotline" between May 6, 2008 and August 8, 2008. (Doc. 15-1, ¶¶'s 19-22; Weatherspoon Declaration, ¶¶ 16-19 and Exs. 9-12 thereto). [2] RL decided to conduct a climate survey of the Tannersville stores as a result of the complaints lodged against Plaintiff from April through August of 2008. (Doc. 15, ¶ 31; Doc. 18, ¶ 31). Sharonda Weatherspoon, then the Director of Human Resources for RL, initially planned to conduct the climate survey in September of 2008; however, after Plaintiff had a seizure

---

[2] In her Rule 56.1 statement, Plaintiff challenges the factual substance of these complaints but does not deny that RL received them.

3

at the store on August 29, 2008, Ms. Weatherspoon decided to postpone the climate survey. (Weatherspoon Declaration at ¶ 21 and Ex. 13 thereto). Ms. Weatherspoon ultimately conducted the climate survey on October 8, 2008. (Doc. 15-1, ¶ 34; Doc. 18, ¶ 34). During the climate survey, Ms. Weatherspoon and several colleagues conducted in-person interviews of the employees at the Tannersville stores using a prepared list of questions. (Doc. 15-1, ¶ 35; Doc 18, ¶ 35; Weatherspoon Declaration at ¶ 24 and Ex. 14 thereto). Although the list of questions did not specifically ask about Plaintiff or her management style and focused on the employees' general experiences at the Tannersville stores, employees consistently brought up Plaintiff and their concerns about the way she treated others. (Doc. 15-1, ¶ 36; Weatherspoon Declaration at ¶ 25). More specifically, employees complained that Plaintiff spoke to customers and employees in a condescending and sarcastic manner, that she ruled by fear, and that her aggressive and volatile demeanor caused the employees to feel constantly nervous in the workplace. (Doc. 15-1, ¶¶ 37-38; Weatherspoon Declaration, ¶¶ 26-27; Weatherspoon Deposition at 40-41).

After completing the in-person climate survey and conducting additional telephone interviews with former employees afterward, Ms. Weatherspoon and her colleagues decided to issue a Final Warning to Plaintiff. (Doc. 15-1, ¶ 39; Doc. 18, ¶ 39). However, in the time between the completion of the climate survey and the

4

time Weatherspoon and her colleagues decided to issue Plaintiff a Final Warning, Plaintiff informed RL that she required a medical leave of absence on October 28, 2008. (Doc 15-1, ¶ 40; Doc. 18, ¶ 40). Due to the timing of her medical leave of absence, Plaintiff did not receive the Final Warning before commencing her leave, although she was advised that she would receive the disciplinary notice upon her return. (Doc. 15-1, ¶ 41; Doc. 18, ¶ 41). Plaintiff did know that the Final Warning had to do with complaints from both customers and co-workers. (Plaintiff's deposition at 259-60).

Plaintiff's leave ran from October 28, 2008 until February 23, 2009. (Doc. 15-1, ¶ 42; Plaintiff's Deposition at 247). On February 10, 2009, while Plaintiff was still on leave, Jill Turner, RL's Fair Employment Counselor, sent a letter to Plaintiff advising her that "...while on leave, you should not contact store employees regarding business matters". (Doc. 15-1, Ex. G; Plaintiff's Deposition at 247-50). Despite Jill Turner's direction to refrain from contacting store employees until she returned to work, on February 17, 2009, while still on leave, Plaintiff sent Colleen Lewis, RL's Regional Director, seven text messages which Plaintiff admits were "nasty" and which she sent because she felt that Ms. Lewis had a "snippy attitude" during a visit to the Tannersville store prior to Plaintiff's medical leave. (Doc. 15-1, ¶ 43; Plaintiff's Deposition at 246-47 and 253-63). On February 24,

5

2009, one day after Plaintiff returned to work, she was issued a Final Warning that cited her "overly aggressive and demeaning" communication style and its contribution to a "poor work environment". (Doc 15-1, ¶ 45; Plaintiff's deposition at 265; Weatherspoon Declaration at Ex. 17). The Final Warning advised Plaintiff that "additional disciplinary action will be taken up to and including termination" if she did not rectify the way she related to her subordinates. (Doc. 15-1, Ex. A, Weatherspoon Declaration, ¶ 17 and Ex. 17 thereto). On February 25, 2009, the day after Plaintiff received the aforementioned Final Warning, she sent insulting text messages to Baehr calling her a "liar" and a "sneak"; advising her that " God is good" and admonishing her to "remember what happened with Judas." (Doc. 15-1, ¶ 46; Weatherspoon Declaration, ¶ 33 and Ex. 18 thereto). On March 3, 2009, RL received an email from one of Plaintiff's subordinates, one Dmitry Kukuy, in which he described a protracted conversation Plaintiff had with him that made him feel "very uncomfortable" and seemed like an "interrogation". (Doc. 15-1, ¶ 49; Weatherspoon Declaration, ¶¶ 35-36 and Ex. 19 thereto). Finally, on March 10, 2009, RL received an email from another of Plaintiff's subordinates, identified as Andrea Berdomas, advising that Plaintiff had come to the store on February 14, 2009 and had accused her of being "behind the phone calls that were made to Fair Employment" and telling her that if she "did anything behind her

6

back she would find out and the end result would not be good." (Weatherspoon Declaration, ¶ 35 and Ex. 20 thereto).

Ms. Weatherspoon and her colleagues then decided to terminate Plaintiff's employment after reviewing her performance history, complaints about her conduct, the content of the Final Warning she received, and what they viewed as her continued unprofessional behavior after she received the Final Warning. (Doc. 15-1, ¶¶ 53-54; Weatherspoon Declaration, ¶ 39). After determining that Plaintiff's termination was the appropriate course of action, Ms. Weatherspoon consulted with RL's Vice- President for Employment Practices, Community Relations, and Diversity, who concurred that Plaintiff should be terminated. (Doc. 15-1, ¶ 55; Doc. 18, ¶ 55). RL terminated Plaintiff's employment on March 13, 2009. (Doc. 15-1, ¶ 56; Doc. 18, ¶ 56).

In support of her claim that RL discriminated against her on the basis of her pregnancy, Plaintiff points to two comments allegedly made by Baehr. (Doc. 15-1, ¶ 58; Doc. 18, ¶ 55). These comments were: (1) Baehr told another employee that she doubted Plaintiff would return to work after her maternity leave; and (2) Baehr commented to some associates that it would be "another Christmas without a manager". (Doc. 15-1, ¶¶ 59-61; Doc. 18, ¶¶ 59-61). Plaintiff does acknowledge that some women choose not to return to work after taking a maternity leave. (Plaintiff's Deposition at 115). She also acknowledges that the only formal

7

performance evaluation she received, an unsatisfactory rating, was not affected by her pregnancy. (Plaintiff's Deposition at 121-127). Noone ever referenced her gender or her pregnancy in connection with her Final Warning or her termination. (Plaintiff's Deposition at 295). Also, she is unaware of other general managers who were treated differently than she was treated by RL (Doc. 15-1, ¶ 68; Doc. 18, ¶ 68). Although Plaintiff believes that RL wanted to "push [her] out just so that [RL] can hire a manager right in time...for Christmas", she acknowledges that she has nothing factual to support that belief and that it is based only on her own feelings. (Doc. 15-1, ¶ 69; Plaintiff's Dep. at 105 and 15). [3] Finally, in stark contrast to the allegations upon which her suit is premised, Plaintiff acknowledged that neither her pregnancy nor her medical leave had anything to do with RL's decision to terminate her. (Doc. 15-1, ¶ 57; Doc. 18, ¶ 57; Weatherspoon Deposition at 44). This devastating admission alone would be enough to justify the Court in granting Defendant's Motion for Summary Judgment. However, in light of Plaintiff's central allegations in

---

[3] At paragraphs thirty (30) and sixty-seven (67) of her Rule 56.1 Response, Plaintiff alludes in cryptic fashion to an employee named Andrea Pangaldi who allegedly can confirm that the complaints made against Plaintiff on the Hotline were orchestrated as sabotage by RL management to remove her from the company by Christmas. It is unclear whether Plaintiff alleges that Andrea Pangaldi would also have knowledge that RL wanted to fire Plaintiff because she was pregnant. In any event, the Court notes that the record contains no deposition of or affidavit from Andrea Pangaldi to support Plaintiff's contention and, as such, Plaintiff's allusion to the potentially pivotal testimony Pangaldi allegedly could provide does not constitute evidence in the context of a summary judgment motion. The Court also notes that at least seven complaints were lodged against Plaintiff before anyone, herself included, knew that she was pregnant.

8

this lawsuit, we have construed this admission as a mistake and have examined the entire record in the process of deciding this motion.

II. **Summary Judgment Standard.**

Summary judgment is appropriate when the movant demonstrates there is no "genuine issue as to any material fact." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

"An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson, 477 U.S. at 248). In determining whether a genuine issue of fact exists, a court must resolve all factual doubts and draw all reasonable inferences in favor of the nonmoving party. Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004).

The initial burden is on the moving party to show an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986) (citations omitted). The moving party may meet this burden by "pointing out to the district court [] that

there is an absence of evidence to support the nonmoving party's case when the nonmoving party bears the ultimate burden of proof." Id. at 325. The non-moving party may not rest on the bare allegations contained in his or her pleadings, but is required by Federal Rule of Civil Procedure 56 to go beyond the pleadings by way of affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Id. at 324.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." Anderson, 477 U.S. at 255. Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

### III. Legal Analysis.

To state a viable cause of action under Title VII of the Federal Civil Rights Act, the Plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she is qualified for the position she held; (3) she was subject to an adverse employment action; and (4) the circumstances surrounding that employment action give rise to an inference of discrimination. *Maky v. Chertoff,* 541 F.3d 205 (3d. Cir. 2008). Plaintiff obviously meets the first three criteria for establishing a prima facie case of

gender/pregnancy discrimination under Title VII.[4] However, the test is conjunctive and she fails to present sufficient evidence to satisfy the fourth part of the relevant test- - that the circumstances surrounding her termination give rise to an inference of discrimination.[5]

A. **Plaintiff's Argument**

Despite Plaintiff's previously referenced failure to cite to the record in her Rule 56.1 Response, the Court has made every effort to find something in the record that would substantiate her claim. The Court has exhaustively reviewed the pleadings, supporting briefs, depositions and affidavits that comprise this record. In doing so, the Court can find no evidence, direct or circumstantial, that Plaintiff was terminated because she became pregnant. The record clearly indicates that Plaintiff was on "thin ice" before she became pregnant. The mere fact that she was terminated after a process that continued during her pregnancy is

---

[4] We are aware that RL's brief contains argument that Plaintiff is unqualified for the job in question. This argument lacks credence because RL did select her for the position and retained her in it for more than 14 months.

[5] The parties have presented argument as to whether this case ought to be characterized as a "pretextual" case or a "mixed-motive" case. The answer to that question would have significance only in the context of deciding how to charge the jury if this case were tried. To decide this Motion for Summary Judgment it is necessary to decide only whether Plaintiff has made out a prima facie case. Plaintiff's burden under either the "pretextual" or "mixed-motive" approaches is to demonstrate that RL used a forbidden consideration with respect to its decision to terminate her. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 91 (2003). Plaintiff could have survived sumary judgment by making this demonstration by direct or circumstantial evidence. Id. Unfortunately, Plaintiff has adduced no credible evidence that RL terminated her, in whole or in part, due to her pregnancy.

11

not, in and of itself, circumstantial evidence that her pregnancy motivated that process. While Plaintiff has testified (Plaintiff's Deposition at 103-105 and 215) that she <u>feels</u> that the numerous complaints to RL's Hotline were company-orchestrated sabotage, her mere opinion as to the nature of these complaints does not constitute credible evidence that they may be linked in any manner to her pregnancy.

With respect to "direct evidence" of RL's alleged anti-pregnancy bias, Plaintiff points to several comments made by co-workers Baehr and someone identified only as "Evelyn" to the effect that the store would be without a manager at Christmas and to Baehr's query whether Plaintiff would be returning to work at RL after her baby was born. Plaintiff's Deposition at 88, 89 114-115). The Court simply cannot categorize these statements as credible evidence of anti-pregnancy bias. Statements to the effect that Plaintiff would not be in the store for Christmas were simply factual and logically flowed from Plaintiff's revelation to Baehr that her due date was December 25, 2008. (Plaintiff's Deposition at 88-89). Similarly, Baehr's question regarding whether Plaintiff would be returning to work after having her child is the sort of logical question that one co-worker might ask another in this situation. Plaintiff herself acknowledged that some women do not return to work after giving birth. (Plaintiff's Deposition at 115-16). These innocuous comments by Baehr and "Evelyn", even taken

12

collectively, are not "disparaging" as Plaintiff would categorize them and they constitute no evidence of pregnancy-based discrimination. Accordingly, we find that Plaintiff has not met her burden under Maky, supra, to establish that the circumstances surrounding her termination give rise to an inference of discrimination.

Despite our conclusion that Plaintiff has not made out a prima facie case, the Court feels compelled to address other arguments raised in Plaintiff's brief. We do so seriatim.

### 1. Argument That Plaintiff Was Singled Out Due To Her Pregnancy

Plaintiff argues that "the way she was singled out and investigated for termination while out on approved pregnancy leave" indicates that she has set forth a cause of action under the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(K). (Plaintiff's Brief in Opposition to Summary Judgment, Doc. 20 at 7). This assertion is completely contradicted by the record which amply demonstrates that Plaintiff was under investigation well before her leave began. Beyond that, each of the cases Plaintiff cites in support of this proposition is inapposite. In *EEOC v. Yenkin-Majestic Paint Corp.*, 112 F.3d 831 (6th Cir. 1997), The Court affirmed a finding of pregnancy discrimination because the Plaintiff: (a) got her first unfavorable evaluation shortly after announcing her pregnancy; (b) presented evidence that she was given

13

a false reason for the adverse action taken against her; and (c) was replaced by someone no more qualified than she. In the instant case, Plaintiff has: (a) acknowledged that her pregnancy had nothing to do with her unsatisfactory performance evaluation; (b) provided no evidence that RL's stated reason for firing her was false; and (c) provided no information about the qualifications or even the gender of the person who replaced her.

The second case Plaintiff cites, *Storch v. Beacon Hotel Corp.*, 788 F.Supp. 960 (E.D. Mich. 1992), concerned a woman who brought forth enough evidence of post-pregnancy intimidation to survive her employer's motion for summary judgment on a constructive discharge claim under Michigan law. The instant case does not include a constructive discharge count and, here again, the Plaintiff has not produced any evidence of post-pregnancy intimidation.

The third case cited by Plaintiff, *Bainbardi v. SBC Warburg, Inc.*, 1998 U.S. Dist. Lexis 13491 (S.D.N.Y. 1998), involved a woman who received good performance reviews and then was fired suddenly and replaced by a man. In the instant case, Plaintiff never received a positive performance review, she was terminated after a process that lasted, at a minimum, six months, and she makes no allegation that she was replaced by a member of the opposite sex. Thus, all three cases cited by the Plaintiff to support the proposition that she was "singled out" for investigation because she was pregnant are dissimilar in significant ways to the instant

14

case and, as such, lend no support to her argument.

2. **Argument That Comparator Evidence Supports A Finding That Plaintiff Has Stated A Prima Facie Case.**

Plaintiff also argues in her Brief in Opposition to Summary Judgment that she has stated a prima facie case of gender discrimination and cites several cases where comparator evidence established that females were treated less favorably than similarly situated males. (Doc 20 at 11). While these cases are undoubtedly good law, they have no application to the instant case because Plaintiff has not provided any comparator evidence to the Court. Indeed, Plaintiff has not even alleged that she was replaced by a man.

3. **Argument That RL's Stated Reason For Dismissing Plaintiff Was Pretextual.**

Finally, Plaintiff correctly cites *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d. Cir. 1994), for the proposition that, to demonstrate that the reason given by an employer for terminating a Plaintiff is pretextual, a Plaintiff must submit evidence "from which a fact finder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." [6] Unfortunately for

---

[6] We note that the *Fuentes* analysis is appropriately used only in cases in which a plaintiff has articulated a prima facie case, something Plaintiff has not done.

15

Plaintiff, the Court finds that the record developed in this case could not provoke a reasonable fact finder to disbelieve RL's articulated reason for firing her or to believe that her pregnancy was a motivating factor in RL's decision to fire her.

**B. RL's Argument.**

RL's pivotal argument is the record it created. In stark contrast to Plaintiff's arguments, RL has presented a well-documented record, thoroughly supported by deposition testimony, numerous properly authenticated exhibits, and a sworn affidavit, of why Plaintiff was terminated and the process that was followed before the decision was reached to terminate her. The record reveals that at least seven complaints were lodged against the Plaintiff by co-workers in the month of April, 2008. There is no dispute that these complaints were made before Plaintiff became pregnant. Thus, it is clear that the events leading to Plaintiff's termination preceded the onset of her pregnancy.

The record further indicates that a number of other calls complaining about Plaintiff's management style were placed to the Hotline between May and August of 2008 and that, as a result of the persistent nature of these calls, RL decided to conduct a climate survey at the Tannersville stores to investigate the complaints. The climate survey was originally scheduled for September of 2008 but was postponed until October 8, 2008 for a variety of reasons that Plaintiff acknowledged to be genuine. (Doc. 15-1, ¶ 33; Doc.

16

18, ¶ 33). The in-person interviews conducted during the climate survey confirmed that Plaintiff spoke to employees and customers in a condescending and sarcastic manner and that she was aggressive and volatile in the workplace. Before RL reached consensus on how to approach the problems the climate survey revealed, Plaintiff informed RL that she would be taking a medical leave of absence. Although she received no written Final Warning before starting her medical leave, Plaintiff was advised that she would be issued one upon her return.

The record also establishes that during the time she was on medical leave Plaintiff sent various text messages that she herself categorized as "nasty" to a former co-worker, Colleen Lewis. RL was aware of these text messages because they were sent to an RL company cell phone. These message provided further corroboration of Plaintiff's abrasive and aggressive behavior.

Plaintiff was issued a written Final Warning on February 24, 2009, one day after she returned to work at RL. The Final Warning admonished her for her "overly-aggressive and demeaning" communication style with her fellow employees and the "poor work environment" that resulted therefrom. She was explicitly advised that RL was concerned that Plaintiff "foster a positive work environment" and not create an environment of "fear and intimidation." Finally, the Final Warning advised Plaintiff: "If these areas of concern do not improve, additional disciplinary

17

action will be taken up to an including termination." Despite this clear direction, in the two weeks following receipt of the Final Warning Plaintiff sent threatening text messages to Baehr, caused Dmitry Kukuy to complain that he was subjected to a lengthy interrogation, and was the subject of still another Hotline complaint. The Court concludes that Plaintiff's conduct after receiving the Final Warning indicated to her employer that she was incapable of conforming her conduct to company expectations, provided ample justification for RL to terminate her, and was the sole reason for her dismissal.

## IV. Conclusion.

In the context of a summary judgment motion, a Plaintiff may not simply rely upon the bald allegations of her complaint and speculative testimony as to what she thinks caused her termination. Rather, a plaintiff, when confronted by a well-supported, case-dispositive motion such as RL has produced in this case, must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex, supra,* at 322-23. To demonstrate that there is a justiciable issue for trial, the affirmative evidence offered by the non-moving party "must amount to more than a scintilla" and must constitute "a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving

party." See *Saldana v. Kmart*, 260 F.3d 228-232 (3d. Cir. 2001). Our review of this record persuades the Court that Plaintiff has not met her evidentiary burden and, consequently, Defendant's Motion for Summary Judgment must be granted.

An appropriate Order follows.

BY THE COURT

12-7-02

/s/ Richard P. Conaboy
Honorable Richard P. Conaboy
United States District Judge

19

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DANIELA MILIOTO-MARUCA

    Plaintiff,

v.

POLO RALPH LAUREN

    Defendant

Case No. 3:11-CV-2120

(Judge Richard P. Conaboy)

## ORDER

**AND NOW** this _7th_ day of December, 2012, for the reasons cited in the Memorandum filed contemporaneously herewith,

**IT IS HEREBY ORDERED AND DECREED AS FOLLOWS:**

1. Defendant Polo Ralph Lauren's Motion for Summary Judgment (Doc. 15) is **GRANTED**.

                                                _/s/ Richard P. Conaboy_
                                       **HONORABLE RICHARD P. CONABOY**
                                       **UNITED STATES DISTRICT JUDGE**